UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>  vs.<br><br>CHARLENE MARIA CORTEZ,<br><br>            Defendant. | 3-02-cr-00088-RRB-JDR<br><br>**RECOMMENDATION<br>REGARDING<br>PETITION TO REVOKE<br>SUPERVISED RELEASE**<br><br>(Docket No. 38) |

This matter is before the court on the government's Petition to Revoke the supervised release of **Charlene Maria Cortez. Docket No. 38.** The Petition alleges that Cortez violated her conditions of supervised release by consuming cocaine on or about April 27, 2006 (Count 1), May 1, 2006, (Count 2), and June 15, 2006 (Count 3). An evidentiary hearing on the Petition was conducted

before a magistrate judge on September 7, 2006. The government and defendant filed post-hearing memorandum. See Docket Nos. 55, 57 and 58 respectively. Upon due consideration of the evidence adduced and arguments of counsel, the magistrate judge recommends that the court adopt findings of fact as set forth and that the Petition to Revoke Supervised Release be GRANTED.

**Findings of Fact**

Charlene Cortez was sentenced on January 24, 2003 by Ralph R. Beistline, U.S. District Judge for the offense of conspiracy to posses with intent to distribute a controlled substance. She was sentenced to serve 18 months in custody followed by 3 years of supervised release. Supervision began April 28, 2004.

Standard Condition of Supervision No. 7 provided: "The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician."

Ms. Cortez was supervised on conditions of release by U.S. Probation Officer Travis Lyons. Ms. Cortez was directed to submit to urine testing and to refrain from possessing or consuming any drugs. PO Lyons met with Ms. Cortez on the average of once every three weeks. Ms. Cortez was set up on a random phone call-in for urinalysis testing.

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

2

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 2 of 15

On April 27, 2006, Cortez submitted a urine specimen for testing to Probation Officer Pamela Shaw. PO Shaw collected the sample and poured it into another cup which had strips to test for various contraband substances. Cortez was allowed to observe this process. When the specimen tested positive for cocaine a seal was placed over the cup and Cortez added her initials and signed a custody sheet which indicated whether she was taking any medications. PO Shaw also signed the form, dated it, placed it in a bag that was then sealed. A chain of custody sheet was wrapped around it before it was placed into a refrigerator until it was sent to a lab for analysis. The custody sheet and the sample were given corresponding numbers. On April 27, 2006 Ms. Cortez told PO Lyons that she had not used or consumed any cocaine. The sample was sent to Scientific Testing Laboratories in Richmond, VA for analysis.

Similarly, on May 1, 2006 Cortez again tested positive and was told that the sample would be sent to the lab for analysis. Cortez denied using or consuming cocaine. On June 15, 2006 Cortez submitted a urine sample that tested positive for cocaine and was informed by PO Lyons that there would be court action. Cortez continued to deny any use of cocaine.

The urine specimen collected April 27, 2006 was given identification number C00466724. It was received by the lab on May 2, 2006 and the testing was completed May 4, 2006. Tr. 49. At the lab the sample passed a "validity test" and

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

3

3-02-cr-00088-RRB-JDR  RR @38 RE Petition to Revoke Supervised Release  10/3/2006; Page 3 of 15
Signed by Judge John D. Roberts

tested positive for cocaine. Tr. 45. It tested positive for Benzoylecgoine, the cocaine metabolite. Tr. 50. The May 1, 2006 specimen was received by the lab on May 5, 2006. Testing was completed as evidenced by a lab report dated May 9, 2006. Tr. 53. This specimen carried identification number C00466729. The June 15, 2006 specimen was received by the lab on June 20, 2006 and the lab report is dated June 23, 2006. Tr. 52. That specimen bears identification number C00466772.

The defendant claims that there has been an inadequate showing of a chain of custody for the three specimens tested. The evidence reflects the handling of the specimen, although testimony was not taken from every person who had handled the specimens. The first and second specimens did not test positive with the first level of testing. Rather they fell between the presumptive cutoff of 300 nanograms and the confirmatory cutoff level of 150 nanograms. Tr. 55. The third sample was not subjected to primary screening by the lab because it was not requested by the probation office.

The director of Scientific Testing Laboratories (STL), Lisa Tarnaimonak oversees the quality control of the lab. The lab performs almost exclusively urine drug testing. Tr. 36. The lab is certified under the Substance Abuse and Mental Health Services Administration (SAMSHA) and follows their standard protocol for testing drugs of abuse. Tr. 37. The Lab follows the criteria for analysis using the

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

4

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR          Signed by Judge John D. Roberts          10/3/2006; Page 4 of 15

SAMSHA Regulations for Specimen Method Validation, instrument maintenance, and control requirements.  Tr. 37.  According to Director Tarnaimonak the method of record storage used by the Lab exceeds the requirements of SAMSHA.  The Lab processes about 200-300 specimens a day.  Confirmation supply cutoffs apply to the testing that reflects as positive based on the presumptive testing and then proceeds to additional confirmatory testing by gas chromatography coupled with mass spectrometry (GCMS).  GCMS is the only methodology accepted for confirmatory testing by SAMSHA and by the U.S. Courts.  Tr. 39.  The Lab performs quantitative testing.  If the specimen equals or exceeds the 150 nanograms per milliliter level it is reported as positive without a quantitative level on the results report.  The 150 nanogram level is just a cutoff that establishes whether a specimen is positive or negative.  That is not the actual level of the specimen itself.  Tr. 41.  According to Director Tarnaimoak the presence of 150 nanograms or more in a urine sample is not indicative of a specific quantity of cocaine consumed.  Because the urine time interval is unknown one cannot relate a urine level back to the amount of cocaine consumed.  The subject could have consumed a small amount of cocaine not very long ago or a larger amount over a greater period of time.  Tr. 41.

   Cocaine that is snorted, ingested, or consumed in food can produce a urine specimen containing enough cocaine metabolite to give a positive result greater than a 150 nanograms per milliliter.  A urine specimen, therefore, that

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

5

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 5 of 15

contains the metabolite of cocaine at a greater than 150 nanograms per milliliter is indicative of the active use of cocaine. Tr. 42.

The Director had all of the documents of testing and chain of custody before her to answer questions pertaining to the particular specimens. Tr. 56. The first specimen, number C00466724 was submitted for a primary panel, a primary drug testing panel, as well as for a confirmation analysis of cocaine. Tr. 44. The primary panel tests for amphetamines, cannabinoids, cocaine metabolites, opiates, phencyclidine, plus three specimen validity tests. Tr. 44. The specimen was confirmed for cocaine metabolite present at greater than 150 nanograms per milliliters. The primary panel test was performed based on a request on the chain of custody form submitted with the specimen. Tr. 44. A validity test was performed for the presence of creatitine, specific gravity and ph. From that test the lab concluded that the specimen was urine and that the concentration of urine was high enough to provide a valid drug test result. According to Director Tarnaimoak this specimen tested positive for cocaine. Tr. 45. The test results were accepted at the evidentiary hearing. The report in front of Director Tarnaimoak reflected the specimen identification, the date collected, the date received and the date reported. Tr. 49. The first specimen tested positive by GCMS for benzoylecogine, the cocaine metabolite. Tr. 50.

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd                                   6

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR          Signed by Judge John D. Roberts          10/3/2006; Page 6 of 15

Cortez argues that the government's evidence did not establish the chain of custody for the specimen when it was removed from the refrigerator at the Probation Office and sent to the lab in Richmond, Virginia. Although the person who actually sent the specimen by mail from the probation office to the lab did not testify, I am satisfied from the evidence that the specimen taken from Cortez on April 27, 2006 was in fact subjected to laboratory analysis as referenced in the report for specimen number C00466724. Similarly, the results of the controlled substance tests for specimens identified as C00466729 and C00466772 confirm that the specimens tested in excess of the 150 nanograms per milliliter as positive for the cocaine metabolite. With respect to the third specimen the lab did not do the primary screening because it was not requested. They only did the GCMS confirmation on the third specimen.

According to Director Tarnaimoak in order for a person to test positive for the cocaine metabolite the cocaine must pass through the donor and be metabolized within the donor's liver in order for the metabolite of cocaine or benzoylecgonine to be present in the urine specimen. Tr. 62. Ms. Tarnaimoak was asked whether a person could test positive for cocaine from having sexual intercourse with a partner who had cocaine on his fingers which he then placed inside of the donor's vagina. She stated that it was not likely that a sufficient quantity

of cocaine would be ingested through the vagina to test positive but she was not aware of any studies that might contradict her opinion.

I am satisfied that the Director of STL possessed sufficient knowledge regarding the proper testing methods at her lab and no evidence was introduced to place the Lab's testing methods in doubt.

Ms. Cortez was married February 24, 2006 and filed for divorce at the end of August 2006. Tr. 69. She testified that while having sex with her husband a few days before April 27, 2006, she noticed that his thumb and index finger contained a gray ashy substance. Based on her experience she concluded that the substance was crack cocaine. Tr. 71, 75. According to Ms. Cortez she was providing U/A samples to the probation office two to three times a week beginning in February 2006. She claimed that these tests produced false positives one to two times per week. Tr. 73. According to Ms. Cortez her husband admitted to her that he was using drugs at the beginning of June 2006. She found an aluminum foil in her husband's shaving kit which she associated with crack cocaine. Tr. 80. She never found any evidence that her husband used powder cocaine. Tr. 81. She obtained a restraining order in mid July against her husband then "took him back" but obtained a second restraining order in August 2006. Cortez claimed that she had sex with her husband on a daily basis and this included allowing him to place his penis in her mouth. When they got back together again at the end of June and

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

8

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR          Signed by Judge John D. Roberts          10/3/2006; Page 8 of 15

August she claimed that they were not having sexual relations.  Tr. 77.   The first time the probation officer told her she had submitted a urine sample that tested positive she did not blame the positive test on her husband.  Tr. 82.

On cross-examination it was brought out that only three of her thirty-seven U/A tests came back positive for the presence of cocaine in her system. Tr. 83.  Thus, her accounting for the cocaine metabolite in her system by having sex with her husband who was a crack addict is inconsistent with the rest of her testimony.  Ms. Cortez had never seen her husband use powder cocaine.  Tr. 85. Actually she never saw him apply cocaine to any part of his own body.  Tr. 85.

The defense offered the testimony of Dr. Naresh C. Janin.  Dr. Janin is the laboratory director of National Toxicology Laboratories, specializing in forensic drug testing and is also an emeritus professor of pharmacology and toxicology for USC School of Medicine in Los Angeles.  Tr. 88.  He testified as an expert in the laboratory protocols for drug testing for cocaine as well on the ingestion of cocaine. Because he had not seen the chain of custody documents or the documents evidencing the individual substance tests, and based on his limited knowledge of the facts of the case, he questioned the validity of the test results.  For example, he had not been shown evidence that the lab ran clean urine runs before and after to make

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

9

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 9 of 15

sure the equipment was calibrated properly.[1] He made clear that he was not stating that the laboratory did not follow the scientific principles, he just didn't know. Tr. 105.

With respect to the transfer and absorption of cocaine through vaginal walls he stated it would depend upon how much cocaine had been placed on the penis. His opinion was consistent with Ms. Tarnaimoak that crack cocaine is not subject to absorption the same way as powder cocaine. He stated that the crack cocaine, the free form of cocaine, is not water soluble and from a scientific point of view pure free base [cocaine] will not go through skin that much. Tr. 108-109.

The testimony of Ms. Cortez concerning the possible transmission of cocaine from her husband's hands or penis into her body is inconsistent, highly speculative, and incredulous. The government need not prove how or exactly when she consumed cocaine to explain the presence of cocaine confirmed by the laboratory tests.

## Conclusions of Law

1.  Revocation of a period of Supervised Release is specifically provided for in 18 U.S.C. § 3583(e)(3), which reads:

> (e) Modification of conditions or revocation. The court may, after considering the factors set forth in section

---

[1] The government never received notice from the defense that prior to the evidentiary hearing that the defendant would be calling on an expert witness.

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd    10

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 10 of 15

> 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), and (a)(6) . . .
>
> (3) Revoke a term of supervised release, and require the person to serve in prison all or part of the term of supervised release without credit for time previously served on post-release supervision, if it finds by a preponderance of the evidence that the person violated a condition of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure that are applicable to probation revocation and to the provision of applicable policy statement issued by the Sentencing Commission, except that a person whose term is revoked under this paragraph may not be required to serve more than 3 years in prison if the offense for which the person was convicted was a class B felony, or more than 2 years in prison if the offense was a Class C or D felony[.]

2.      Revocation is an exercise of broad discretionary power by the trial court akin to that used in imposing a probation sentence initially.  Compare Burns v. United States, 287 U.S. 216, 221 (1932); Gagnon v. Scarpelli, 411 U.S. 778, 784 (1973); United States v. Dane, 570 F.2d 840, 845 (9th Cir. 1977).  Revocation

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd

11

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 11 of 15

proceedings are not criminal proceedings. Evidence that would establish guilt beyond a reasonable doubt is not required. Evidence rising to the level of substantial evidence is not even required, absent arbitrary and capricious action in the revocation. What is required is that evidence and facts be such as to reasonably satisfy the judge that the supervisee's conduct has not been as good as required by the conditions imposed. United States v. Leigh, 276 F.3d 1011, 1012 (8th Cir. 2002)(revocation of probation); United States v. Francischine, 512 F.2d 827, 829 (5th Cir.) cert. denied 423 U.S. 931 (1975). Thus, the Court must be "reasonably satisfied" that a violation has occurred. United States v. Carrion, 457 F.2d 808, 809 (9th Cir. 1972), cited approvingly in United States v. Lustig, 555 F.2d 751, 753 (9th Cir. 1977). The court applies a preponderance of the evidence standard and the burden of proof is on the government.

       3.     A revocation hearing was conducted pursuant to Local Criminal Rule 32.1(a)(2). Federal Rule 32.1 demonstrates a legislative intent that a revocation proceeding be conducted without evidentiary formalities that characterize a criminal trial. Revocation proceedings do not punish a defendant for a new offense; they trigger the execution of the conditions of the original sentence for the offense of the defendant has already been convicted.

       4.     Defendant Cortez knowingly and voluntarily associated herself with her husband while he was using cocaine. By doing so she would have had

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd    12

3-02-cr-00088-RRB-JDR | RR @38 RE Petition to Revoke Supervised Release
Signed by Judge John D. Roberts | 10/3/2006; Page 12 of 15

access to cocaine during the time intervals she tested positive. She noticed what appeared to be drug residue on her husband's hands only once and that was a few days before April 27, 2006. Regardless of whether her husband was the source of cocaine, I conclude that she is responsible for the introduction of the cocaine into her body which was evidenced by the presence of cocaine metabolite. There is no claim that her husband forced her to conduct herself in manner that placed her at risk of violating her supervised release. Even after she told her probation officer that the (presumptive) test may be positive because of recent sexual relations with her husband, she still continued to test positive in subsequent months.

      5.      I find by a preponderance of the evidence that Charlene Cortez ingested cocaine prior to submitting the three urine samples. I find the three urine samples tested were supplied by Cortez. Scientific Testing Laboratories, Inc., confirmed that each of her urine specimens tested positive for the presence of cocaine. She signed the collection documents which bore the specific specimen numbers. Based on the totality of the evidence I am satisfied that proper testing procedures were followed at Scientific Testing Laboratories, Inc., for the Cortez samples tested.

      6.      Upon due consideration of the evidence adduced and arguments of the parties I conclude that Charlene Cortez has consumed cocaine in violation of the Standard Condition of Supervision No. 7 as alleged in Counts 1 through 3 of the

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd    13

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 13 of 15

June 28, 2006 petition (Docket No. 38). The determination of what action the court should take as a result of the defendant's violations is a matter reserved for the assigned district judge.

DATED this 3rd day of October, 2006, at Anchorage, Alaska.

/s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON, Tuesday, October 17, 2006**. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before **NOON, Tuesday, October 24, 2006**. The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

      Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. <u>See</u> <u>Hilliard v. Kincheloe</u>, 796 F.2d 308 (9th Cir. 1986).

3-02-cr-00088-RRB-JDR CORTEZ @38 RR Re Pet Revoke SR.wpd    15

RR @38 RE Petition to Revoke Supervised Release
3-02-cr-00088-RRB-JDR    Signed by Judge John D. Roberts    10/3/2006; Page 15 of 15